Nielsen Media New Holdings v. the Nielsen Company Mr. Dupree, we are ready when you are Go ahead Thank you, Judge Perez. And may it please the Court, Tom Dupree on behalf of the Nielsen Company. We are here challenging a preliminary injunction that bars us from offering to sell our product at a price that the district court may someday deem to be commercially unreasonable. This Court should vacate that injunction because it rests on a flawed theory of constructive tying, because the plaintiff, Cumulus, has failed to prove irreparable harm, and because the injunction fails the specificity requirement of Rule 65. I'd like to start with tying. There is no actual tie in this case. The Supreme Court has said that where, as here, the buyer is given the freedom to purchase either of the two products separately, there is no tying problem. What do we do about that being an illusory offer, or at least the district court suggesting that wasn't real? Well, it most certainly was real. I don't think the other side would say it wasn't real. In other words, what happened is we made an offer to sell the nationwide product on a stand-alone basis. No, I understand that. And your view is that whatever that dollar amount is, it doesn't have – it could not have the effect of tying. Correct. Okay. That's exactly right. And that's what the Supreme Court has said, is that Why is that? Because it was the first offer? Because it – why could it never have the effect? It – because we did not condition the purchase of stand-alone nationwide on their purchasing the locals. There was no tie. There was no conditioning. A tying arrangement, Your Honor, is simply where the seller refuses to sell the product on a stand-alone basis and says you must purchase A and B together. We won't sell you A stand-alone. That's not what happened here. We offered them nationwide on a stand-alone basis. They never countered the offer, and instead they sued us. There's no basis in antitrust law for finding a so-called constructive tie based on an initial offer for a stand-alone product. But that's the part that I'm trying to unpack. How much – I mean, the position that you took when you answered Judge Nathan's question was different than what I thought you would say. I thought you would say what you just said now, which was this was our starting position. We don't know where we ended up. But I thought I heard you say it doesn't matter. Like, it could have been, you know, ten times what we did. Just the mere fact of offering something, even if it wasn't practical, feasible, reasonable, meant that there was no tie. Well, I think we're making both points, Your Honor. And both points are a reason why there's no tying agreement. With regard to the initial offer point, that's what this Court said in American Manufacturers, that you don't impose antitrust liability based on hard bargaining or based on initial offers. You're talking about the second iteration of that case, which was the review after the jury trial? Yes. Sorry, of the bench trial. But the review of the factual record, and you're ignoring, I think, the holding of American Manufacturing 1, which seems to allow precisely this theory, as does the Supreme Court's decision in Lowes. You said in response to my question that the Supreme Court does not permit this notion of, it hasn't called it constructive tying, but it doesn't allow it. And what's your basis for that contention? Well, I would first point the Court to Jefferson Parish. That's the case where the Supreme Court said, and it cited, it quoted its prior language in the Northern Pacific case, which said that there is no tying problem if the buyer is given the freedom to buy either of two products on a stand-alone basis. So that's in response to that authority. Then with regard to Your Honor's point. You read that language to preclude any theory of constructive tying expressly. Correct. Yes. And then I would also say, with regard to the American Manufacturers, that this Court has also expressed caution about relying on that language that the plaintiffs cite from the Lowes decision, which appeared in the Court's discussion of remedy, as articulating a substantive standard for liability. So we think that they are over-reading that case in saying that it supports what happened here. The other point I would make is that there are more recent Supreme Court decisions, namely Trinco, namely Pacific Bell, where the Supreme Court has said that sellers are free to charge whatever price they want, absent conditioning or predatory pricing. So I think the recent Supreme Court antitrust jurisprudence, beginning with Jefferson Paris and then running through Pacific Bell and running through Trinco, makes clear that that phrase that they rely on from American Manufacturers doesn't bear the weight that they claim it does. If I could address the other two grounds on which we think the injunction should be vacated. Irreparable harm. They have not proven irreparable harm. Their claimed harm is monetary damages, a classic example of damages that can be fully remedied through an award of money damages. The district court included sort of classic business harms, customer loss, goodwill, market share. We've got cases which all recognize those as irreparable harms. So setting aside the district court's finding about consumer harm and setting aside the reduction in competition, could you just address why we should conclude clear error, I guess, as to the business harm findings? Yes, because all of those harms that the district court articulated are downstream harms that result from their failure or refusal to pay the price. In other words, this Court has said in Freedom House and elsewhere that when you have this situation, the remedy for the plaintiff is they pay the money and then they sue for money damages. All of the harms that Your Honor identified, all of those are derivative from, are caused by, and flow from, that failure to pay the fee, the money. So they don't see that. But Blackbridge talked about customer loss. Why isn't that comparable to the finding here? Because all of that, all of those types of harms that Your Honor articulated flow from that initial failure to pay the money. They all flow from that. They can't stand on their own as a form of irreparable harm when they're all derivative from this failure to pay, which, again, is fully compensable by monetary damages. But the question is whether those harms are compensable, are measurable and compensable, even if they flow from. I would not quarrel with you that there can be cases where those types of harms would not be fully compensable. But I don't think that's directly relevant to the point at issue here. Again, which is that those are all downstream derivative harms. The real harm here is an overcharge. They are saying we are going to force them to overpay for the stand-alone nationwide product. That is an injury that this Court has said is fully remediable. But so if nonmeasurable, noncompensable harms flow from some other harm, it's out of the bounds of irreparable harm? Well, if that some other harm is a harm, namely an overcharge, failure to pay that is compensable by monetary damages, then the answer is yes, absolutely. The final point, very quickly, and I would like to reserve some time for rebuttal, the Rule 65 point, the injunction here prohibits us from offering nationwide at a price that the district court may someday deem to be commercially unreasonable. I think this is a classic example of an injunction that is insufficiently specific under Rule 65. Let's say I agree with you. Go ahead. Let's say I agree with you on that point, disagree with you on your prior arguments. What would you suggest would be a specific remedy? Vacate the injunction. Vacate the injunction. And then what? And then back before the district court. Do you want to just set the price for the parties? What's going on? I mean, what do we do? What's going to guide us? You would vacate the injunction, step one. This case, this is a preliminary injunction appeal, so it's an interlocutory appeal. There are trial proceedings, currently stayed, but there are trial proceedings ongoing before the district court. So the result would be you would issue an order that vacates the injunction for failing to satisfy Rule 65 specificity standards. And demands for a more specific injunction. Well, I think. And then my question to you is what would that look like? Well, certainly we would argue in that universe that there is no basis for a preliminary injunction. I understand. Not just because of the law, but also because of the changed circumstances. The bankruptcy. That's a perfectly good argument for modification of the injunction before the district court in the first instance. So I'm going to set that aside. Under the circumstances of this record and on appeal, and maybe you could make those arguments to the district court. But setting the bankruptcy aside, what would you have the district court do? Bring in experts and set a price? Well, no, I would not, because I think the Supreme Court has been extremely clear about one thing, which is that district courts should not be in the business in antitrust cases of setting prices. You need to tell us something if we're supposed to say that they need to provide further guidance. Right? You need to give us what an example of that might look like. I think the example would look like the order would say the injunction is vacated because it violates Rule 65. The case is remanded to the district court for further proceedings. At that point, we would go back to the district court. When the stay lifts, we would reengage on the question. The district court would make a fresh assessment of all the PI factors in light of the changed circumstances arising from the bankruptcy and proceed as follows. I think it would be a simple opinion from this court. The district court then would have the case back. It could decide whether a preliminary injunction was warranted. I'm sure we would reengage on all those legal issues. We would discuss the changed circumstances of the bankruptcy, and the district court would issue a ruling if they sought to seek another PI. So relating to changed circumstances, you argue that a vacater is proper because Cumulus's irreparable injury theory depended heavily on threatened bankruptcy, and bankruptcy has already occurred. This Court, we review the district court's irreparable harm analysis for abuse of  What is the relevance of subsequent charges in the alleged irreparable harm? Well, let's see. I take Your Honor's point that if the question is, was the injunction invalid or unlawful at the time it was entered, then the subsequent bankruptcy would not have an impact on that. I'm not quarreling with Your Honor on that point. But what I would say is we think that the irreparable – they failed to prove irreparable harm at the time the PI was entered, and we think that the changed circumstances have made it even more difficult for them to show that there is irreparable harm. Courts, district courts, this Court's obviously retained power to modify or vacate injunctions as circumstances change. And so we think the bankruptcy is relevant because their filings in that bankruptcy confirm two very fundamental points. One is that we, Nielsen, were not in any sense responsible for this bankruptcy, which their CFO has said in a sworn affidavit was caused by larger market conditions, interest payments and the like. The second point is that their CFO said in his sworn declaration that in a few months when Cumulus emerges from the bankruptcy, it will be effectively a new company, a much greater financial strength, like a butterfly emerging from the cocoon. He said that they will resume their ordinary course operations. He said that there is no likelihood of further reorganization or bankruptcy. And he did not say – this is the key point – he did not say that this proceeding and the preliminary injunction are vital to Cumulus's continued survival. That's the argument their legal team is making to this Court. But you know something? Their CFO didn't breathe a word of it in his sworn declaration to the bankruptcy court. He tells a tale of a new company, financially solid, able to pay the price. Those are the same circumstances that are highly relevant to the decision before this Court. Can I ask – I want to go back, because you're avoiding it a little bit, to try to pin you down. Again, assume I disagree with your merits arguments, but I think there's a lack of specificity in the injunction here under Rule 65. It seems to me the choices – I mean, really, the options are, under the current injunction, you go and negotiate and you figure out a price, presumably some kind of argument over what is a reasonable monopolistic price for the standalone nationwide product. And if the other side thinks it's too high, then there's some kind of contempt proceeding. Then experts come in and fight it out in front of the district court. Or you do that on remand to the district court, setting aside the bankruptcy question and change circumstances. Isn't that really sort of what the choices are here? Well, I mean, the way Your Honor put the question, I'm – frankly, I am hard-pressed to come up with an answer for the Court's question about what would an injunction look like, because the various options we've been discussing are foreclosed by Supreme Court precedent, such as the price injunction. Again, the Supreme Court has told us time and again district courts can't set prices. They've also said that district courts shouldn't act as supervisors of private commercial negotiations. I mean, I think what you're saying is that the only thing that we can do on remand is tell them to reconsider their imposition of the preliminary injunction to begin with. I mean, is that what you're – I mean, are you trying to dress up a reconsideration motion as a remand for Rule 65? No, Your Honor. I'm not trying to – yes. You just said that the two things we're talking about are not something that is permissible to do. Well, I was responding to the hypotheticals from Judge Nathan about could the district court issue an injunction that said X or Y, or what sort of injunction would it look like, and all I'm saying is that I am hard-pressed to think of an injunction in this context that would pass legal muster. But that then suggests that maybe what the district court did here was exactly right, which is to say it's got to be commercially reasonable, but there's a floor which is comparable pricing for the standalone product for other consumers. I mean, that – why – yes, it's – we don't know exactly what that number looks like, but if there's no more specific option available, then maybe that does satisfy Rule 65. Well, I would disagree with that, Your Honor. I think that – And I think you have to offer something. You have to offer some option available to the district court. Again, you know, assume I disagree with all of the other arguments, but I'm inclined to disagree with you on specificity. It seems to me if you can't offer some more specific option, then that is a pretty big tell that what the district court did was as good as you get. Well, but as good as you get. This is an area where the district court should not have been issuing injunctions in the first place. I think that's the heart of the problem here. And the other point, and I think one reason why I think it's difficult to have this discussion, is that the injunctions that the district court issued and the ones we've been talking about, none of them solve the alleged harm that Cumulus is going to suffer. That their alleged harm, as I understand it, maybe we'll hear something different, is that they fear they could lose access to the nationwide product, and that would cause the loss of customers and revenue and that sort of thing. But these price injunctions are disconnected. We're not under any order to sell the product to them. There is a disconnect. Injunctions 101 is the injunction has to remedy the harm. And none of these price injunctions remedy the harm that Cumulus says it's going to suffer, which is not getting the nationwide product. So that's, I think, another reason why this is simply not the context in which an injunction is appropriate. If I agreed with everything, if your the view of the law that Your Honor articulated is right and all of that, the proper way for this to play out is for there to be an antitrust hearing or trial, and if we're found to have violated the antitrust laws, well, then we would pay money damages. That's how it plays out. The injunction thwarted.  I did just have one more question. We asked you, and you briefed it, both sides agree on the bankruptcy stay. I gather the position is that we should adopt the Third Circuit's disaggregation approach. We don't have any circuit precedent that directly requires that. But the suggestion is to adopt, as the other circuits that have considered it have, the Third Circuit approach, correct? Yes. I think this is one of the few points on which the parties agree, that we think the automatic stay applies. We think the Third Circuit's rule is correct. I would note that if, regardless of what the Court decides on the automatic stay, of course, this Court also has the discretion to stay the proceedings, to stay this appeal, just as a matter of discretion, hold the case in abeyance. So I would say that there's that aspect to the stay question, too. In other words, there's the automatic stay question, and then there's the question of whether a discretionary stay would be warranted. But as far as the automatic stay goes, yes, Your Honor, we agree that this Court should follow the Third Circuit. Could I ask one quick question? Going back to Lowe's for a second, where the Court held that a preliminary injunction may restrain conduct that itself is not illegal when viewed alone. Assuming arguendo, this is following up on some of the back and forth, that Keyless is likely to succeed on the merits in its claim that the network policy violated Section 2 of the Sherman Act, does Lowe's permit the District Court to enjoin Nielsen from charging a commercially unreasonable rate for the nationwide report as a complete standalone product? Let's see. The answer is Lowe's does not authorize an injunction requiring us to charge or not charge certain prices. I think the proper reading of Lowe's in the language that Your Honor quoted is, number one, it was a remedial portion. Number two is that even if we agree, I think, at a high level that a court can enjoin conduct that standing alone may not be unlawful, that I think kind of begs the question about is an injunction nonetheless appropriate in this case. And I think one thing we have learned from the modern Supreme Court cases is that sellers are free to set their own prices, absent extraordinary circumstances, not present here. And that's just the fundamental problem with reading Lowe's the way they do, is because they would read Lowe's to say, well, actually, District Courts can issue price-setting injunctions, which, again, is 180 degrees contrary to what the Supreme Court has told us time and again. Okay. We'll hear from you, Your Honor. May it please the Court, Katie Wellington on behalf of Cumulus. This Court should uphold the injunction. The District Court held a three-day hearing and considered evidence from 14 witnesses, made factual findings that are fatal to Nielsen's case on appeal, including findings that Nielsen engaged in coercive conduct and that Cumulus's loss of nationwide this September will irreparably injure its customer relationships, goodwill, and market share. I want to start with Nielsen's argument that Supreme Court precedent prohibits the tying theory that we have here. And I would start just with Jefferson Parish. Jefferson Parish is focused on coercion. The question is not are these products sold separately. It is whether the monopolist is coercing the purchase of the products together. And that's what — What is the test for coercion, then? Sure. So the test for coercion, I'll cite Jefferson Parish first and then Lowe's. So Jefferson Parish, the seller's exploitation of control over the tying product forces the buyer to purchase a tied product that the buyer either did not want at all, so that's the case here, we don't want all this local data, or might have preferred to purchase elsewhere on different terms. That's also true. We want to purchase this data elsewhere from Nielsen's new competitor, Eastland, on different terms at a lower price, which is just essential to us right now given our deep financial hardship. Lowe's directly addresses this as well. It prohibits a price differential between a film offered individually and a film offered as part of a package, which has the effect of conditioning the sale or license of one film on the sale or license of another film. And we have a factual finding here of conditioning. Nielsen argues there's no conditioning here. The district court held at SA39 that Nielsen is conditioning access to Nationwide on purchase of local ratings data. So when we talk about cases like Trinco and other Supreme Court cases, they're not saying that a monopolist can do whatever it wants. It can charge whatever price it wants. What those cases hold is there's no problem if there isn't anti-competitive conduct. But there is anti-competitive conduct when we're talking about tying. That's the purpose of the tying doctrine, to address the specific situation where there's monopoly power and coercive conduct. American Manufacturers II. Right. Where the court held that an unlawful tying arrangement did not exist based on a mere statement of bargaining terms. Could you explain why this Court should not consider Nielsen's standalone offer to be a mere statement of bargaining terms? Right. So in American Manufacturers II, there was a hearing on this issue. The judge took testimony and concluded in that case that the seller actually didn't care about the bargain, didn't care about the package, didn't matter what the terms were. Here we have a district court who also held a three-day evidentiary hearing and concluded, as a matter of fact, the cumulus did care, that it didn't want to buy all of this data. It wanted to buy a narrower set. And then it made specific factual findings of coercion with respect to the specific standalone offer. And so we have that in the record here. Can I ask you about one factual question about that? I gather we're not using specific numbers on the record. But the district court concluded that the standalone price was ten times what the bundle price would have been, I think. Ten times what cumulus paid for nationwide products alone under the last contract. I cannot discern where that comes from. Can you? Right. So to be clear, prior to this anti-competitive tying policy, Nielsen offered us separate pricing for nationwide in our local data. So we actually know what price they were trying to charge us for nationwide under that contract that's expired. And it's ten times less than what they're trying to charge us. That contract disaggregated the cost?  It did. Yes, including for all the local data. Is that in the record? Yes, it is in the record. Do you have a site for that? I don't have a site for you right now, although I might be able to get one. And so I also want to respond specifically to the argument that we didn't counter. So first of all, the standalone offer for nationwide was the fourth offer that Nielsen made. It was made only after we pointed out the anti-competitive conduct in this case and said you can't have a tying policy. So they come back and say, sure, you can buy my product at a standalone price, but it's so high that no one's ever going to actually purchase it. Can we say that as a matter of law, that untested opening offers have to be coercive? So this is not an opening offer. It is the fourth offer, and we counter-offered. So the very next counter-offer, we said, okay, here's the price. This is our counter-offer. On October 13, 2025, we said, here's the price we will pay for nationwide. Very similar to the price that we've been paying on our last contract. And here's the price that we'll pay for local data. So we clearly counter-offered that. They came back with two more offers and said, actually, we're just going to return to our tying policy. We want you to buy nationwide and all local data. We counter-offered again. That's the fifth counter-offer and the last offer on this record and said, here's the exact price we'll pay for nationwide. Here's the exact price we'll pay for the local data. We need both of those things. And that's the last offer on this record is our counter-offer. So to say that this was some kind of opening offer that we didn't respond to is simply wrong. I'll point out that that's an argument they made in their proposed factual findings, and the district court didn't adopt it. So that's already been litigated and already been decided by the district court. I want to turn now. Sotomayor, so assuming I agree that there's constructive tying is available as a theory, the next step then in your argument is that the Jefferson Parish per se rule of per se noncompetitive activity follows. Why should that be the case? And what's your best support for that? So this Court can decide the case is a per se tying case. That's what Jefferson Parish says. You don't have to do that because the district court here went through the rule of per se tying and certainly rejected all of the procompetitive justifications they put forward. They said, well, actually, our product's so great, everyone will want to buy it. The district court said, well, that's not true on the record. They said we have these high fixed costs. You know, we have to recover them. The district court said, look, you had a three-day hearing. You didn't actually put any evidence in on that. That's totally speculative. So they had an opportunity to put forward these procompetitive justifications. So you'd be content with a holding that doesn't resolve that question? Totally content. And we think the record very, very much supports this. I did want to move to the irreparable injury argument. We have clear findings here from the district court that we cannot afford to pay ten times more than what we're paying under our old contract for this product, that we cannot bear that cost. Those findings are not clearly erroneous. We are going to lose access to this product in four months. When we do that, we are going to lose our customers because our customers need access to this product for us to sell these national advertising placements. We're going to lose customers. We're going to lose market share. We're going to lose goodwill. We aren't a company that has thousands and thousands of customers. We have a smaller number of customers. They're really important customers. They're longstanding customers. If we lose those customers, we can't get them back. We are in bankruptcy right now. We're going to emerge from bankruptcy $100 million in debt, and we are expected to lose $15 million next year. That's after reducing our debt burden. This is a struggling company. We are in dire financial circumstance. So I think there's a clear finding of reparable injury. I wanted to move to the scope of the injunction. I think Your Honor's questions are right because they have not identified any other injunction that would be better. I think that the injunction here is actually quite elegant because what it says is let the market set the price for Nationwide. Nielsen is selling Nationwide right now as a standalone product. There is a market price for this product. And the district court said it's presumptively reasonable if you're charging us no higher than what you can actually get on the open market. To the extent this court's concern is, you know, how is Nielsen supposed to know what its prices are for all of 2026? The first answer is that these contract negotiations for 2026 typically happen in 2025. So that's when the parties' negotiations here occurred. So Nielsen certainly knows what its products are for 2026. But if that's the court's concern, you can say, all right, you know, they can charge whatever price they've gotten for the past 12 months or something like that. If this court is looking for other alternatives, you can look at the injunction that was upheld in Lowe's. And there the Supreme Court expressly upheld an injunction that prohibited a price differential between a product offered individually and as part of a package which has the effect of conditioning the sale of one product on the sale of another. I think that's another way of saying you have to charge a commercially reasonable price. I mean, isn't it difficult to assess commercial reasonability? I mean, we have, with respect to the nationwide data, Nielsen's consent monopoly prices as a standalone. And I presume it's fairly bespoke contracts based on who the consumer is. And so we've got quite a wide range, wide dollar range between other contracts in the record and the offer amount for the standalone product here. How do we know what within that range would be commercially reasonable? How does one know? And don't you go into those negotiations with the threat of contempt in hand if we don't know? So we have no problem with the district court making a determination. We're not going to go seek contempt. What we really want is this product. We want to be able to buy this product without this anti-competitive tying policy. If they want to go to the district court and say we want to charge X dollars, can I get a finding on that, they are free to do that. They can go to the district court at any time and seek to modify the injunction, seek clarification. I think what their position — They could say to you in light of the injunction, we don't want to sell to you, right? I disagree with that for two reasons. First, they have never said they won't sell to us. In fact, there's just — They're stopped from doing so, which prevents them. Right. So they've made eight offers. We've made five counteroffers. To the extent their position is we want to sell our product with this anti-competitive tie, we do not want to be subject to this injunction, that would be trying to violate the anti-competitive — the laws on tying as well. That's exactly what the Supreme Court held in Lowe's. That's the third part of the injunction in Lowe's, which is designed to get exactly that situation where the defendants there were like, sure, we'll sell you our products separately, but, like, we're really not going to pick up the phone, we're not going to do it very quickly. Do you think this injunction prevents them from refusing to sell? No. But I think that if they take the position that we're not going to sell because we want to maintain an anti — We're going to make you complain.  We could see — like, I don't think they're going to do that. They've never said they're going to do that. But if they did that itself — Well, the suggestion was that this injunction doesn't address that harm because it doesn't guarantee your purchase of the product. It doesn't address that harm because Nielsen at the hearing said, you know, of course we want to get a deal done. They've always said we need to sell this product, we want to recover our costs. There's no indication that they don't want to sell to us. If, you know, we got into a situation where they said we don't want to sell to us, there's case law that, you know, if we can show that it's for anti-competitive reasons because they don't want to comply with this injunction, certainly that itself would violate antitrust law. But we just don't think we're in that situation. You can read their entire brief. They never say we don't want to sell this product. They instead said we've got to sell this product because we want to recover our costs. What do we do about the fact that you are the largest customer of Standalone nationwide? So by setting it at the price of other folks, they may have to take a loss on it. It's not — based on the record, I don't know if that's actually true. I think there is record evidence of a larger company and a price in the market right now for Nationwide. So we are not the largest Standalone customer of Nationwide, as I understand the record. And I would also point out, you know, they are charging other people a price for this product. So, you know, if their view is we have to charge ten times more, they could have put cost evidence in the record. The district court examined that argument and said you didn't put any evidence in that you had to charge this price to recover your costs. So I think that's foreclosed by the district court's findings here, and they really haven't made any clear error argument that I think would be persuasive. Can I ask — this sort of relates to the bankruptcy and the stay and the stay of everything in the lower court. You had said in your brief that you requested a decision by September 1st. Does that date still stand as a request? And if so, why? So we will lose access to Nationwide whenever they put out their new Nationwide product. Historically, that has been Labor Day. I spoke with my client, and it could be even earlier than Labor Day, could in theory be the end of August. So we certainly would request a ruling by September. My client cannot afford to buy this product at a 10X cost. It will lose its customers. It will lose its market share as soon as that new product is released. And indeed, we've talked about this. The uncertainty here is already impacting our customer relationships. So we would very, very much request a ruling as far in advance of September 1 as we can get. And certainly, if we have to go back to the district court and talk about, you know, what this injunction should be, we think this is an appropriate injunction, similar to the injunction upheld by the Ninth Circuit in the Google Play case just last year. But if we have to modify it in some way, we need some time to do that because we really do need to work this out before we lose access to this product. Did your colleague hand you a record site for me? Did we get a record site?  Okay. The current pricing, I have SA-439 and 463, site and response brief 8 through 9. Thank you. Thank you. Thanks. Mr. Dupree, you've got three minutes on the call. Thank you. A few discrete points. First, when my friend refers to this 2 or 3, whatever the low price was, and we talked about the allocation grid, that is not a price. Those numbers, as the Court will see, appear on an allocation grid, which is simply the way, after the overall price has been designed, that the parties would allocate each part of the fee to particular items within the bundle. It is not a price. And I hope the Court doesn't think, oh, you were selling it for this very low amount. It is not the price. It is merely an allocation that appears in the allocation grid. Allocation of what? Allocating the total price based on the certain items. So, for instance, it would say we're going to allocate, you know, 3 million of the total purchase price to Nationwide. We're going to allocate 1 million to this, 1 million to that. It's an accounting allocation. It is not a price. A price is something where you would say we will sell you item A in exchange for this. Allocation is simply accounting, bookkeeping of how you are going to assign certain amounts to a total price to account for the various items within that bundle. The second point, when the Court asked about, well, you know, this is expensive, why did the price go up so much? The other fundamental point I hope the Court appreciates is that Nielsen incurs its costs at the local level. The costs of assembling these reports are incurred for developing the local products. The national product, the national report is simply a roll-up of all the individual local products. And so if you have a universe where someone is simply subscribing to the national product or one local product and the national product, but not all of the local products, they're free-riding, and we're not covering our costs. It's obviously very expensive to assemble all the local materials, and so, therefore, if you were to sell national without the locals at a very low level, you're not remotely coming close to covering your costs. So, therefore, you should use your monopoly power in the nationwide market to tie a price in the local market for which there are competitors? Well, we're not monopolists. In other words, there was a witness, the head of Eastland, which is one of our competitors, testified at the hearing where he testified that he could develop a national product in one year for $5 million. To be a monopolist, there have to be barriers to entry. You can't get in the market immediately, and the testimony at trial was there is no barrier to him coming in and getting a national product. If I could just make two very quick points. We had some discussion about whether or not there was a counteroffer, and my friend says we made counteroffers. When we were here just a month ago arguing in this very room, this very podium before the motions panel, Judge Bianco asked my friend, did you ever counter just on a stand-alone national rate? And my friend said, as far as I know, haven't countered. Well, they mentioned an October date. Did that happen or did it not happen? It did not happen with a stand-alone rate. In other words, what they are doing, Your Honor, is they are looking at the older the prior negotiations where we were discussing package deals for different combinations of products. When they objected to this, the network policy, and said, well, we don't want to buy all this, we just want nationwide stand-alone, we said, okay, here we go. And so then we began the negotiations. We opened with a, you know, the district court viewed as an exorbitant price for stand-alone. They never countered it. Never. They immediately sued us. And that is why, at least the motions panel, was somewhat exercised, because this Court has said you cannot impose antitrust liability based on bargaining or an opening offer. And this was bargaining in an opening offer. That's the focus of our discussion before the motions panel that, again, said the Second Circuit is saying you can't impose antitrust liability in this context. The final point I would make is, with regard to a potential injunction, I hope the Court appreciates it is very hard for any company to conduct commercial negotiations if, by making an offer, merely making an offer, you could be hit with a contempt sanction. If the ultimate goal here is, as Cumulus says, for them to get access to nationwide, the best route to that goal is to allow the parties to engage in free negotiations. It makes it far more difficult to negotiate and to reach a deal if you think, oh, my gosh, if we step over some undescribed line, we're going to get hit with contempt. I think then, Judge Nathan, the point you made about, well, maybe they just won't sell it to you. That possibility becomes increasingly likely or the possibility that we simply have to discontinue the nationwide product. The best route to achieving what Cumulus says it wants here, access to nationwide, is for this Court to vacate the injunction and let the parties get back to negotiating so they can strike a deal. Go ahead. That's right. So what you're saying is that you would engage in further negotiations? Absolutely. Absolutely. A hundred percent. And we're just asking this Court to give us the freedom to do that without the specter of contempt, a Damoclean sword of contempt hanging over us for making an offer. Okay. Thank you so much. This was very helpfully argued, and we will take it under advisement.